IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| RYAN MORROW, | § | |
| | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case No. _____ |
| | § | |
| STEVEN TEMPLE, KIMBERLY | § | JURY DEMANDED |
| TEMPLE, and 4 ROPIN RANCH, INC., | § | |
| | § | |
| Defendants. | § | |

### PLAINTIFF'S ORIGINAL COMPLAINT AND JURY DEMAND

Plaintiff RYAN MORROW ("Plaintiff" or "Morrow") files this his Original Complaint and Jury Demand, complaining of defendants STEVEN TEMPLE, KIMBERLY TEMPLE, and 4 ROPIN RANCH, INC. (collectively "Defendants"), and for cause of action respectfully shows as follows:

### I.   PARTIES

1.      Plaintiff, RYAN MORROW, is an individual residing in May Pearl, Ellis County, Texas, and is a citizen of the State of Texas.

2.      Defendant STEVEN TEMPLE is a natural person who resides and may be served with process at 11080 W. Adonis Road, Marana, Arizona 85658, and is a citizen of the State of Arizona. Steven Temple is President, Chief Executive Officer, Director and a shareholder of 4 ROPIN RANCH INC.

3.      Defendant KIMBERLY TEMPLE is a natural person who resides at and may be served with process at 11080 W. Adonis Road, Marana, Arizona 85658, and is a citizen of the state of Arizona. Kimberly Temple is Director and Secretary of 4 ROPIN RANCH INC.

4.      Defendant 4 ROPIN RANCH, INC. is an Arizona corporation with its principal place of business at 11080 W. Adonis Road, Marana, Arizona 85658, and is a citizen of the State of Arizona. 4 Ropin Ranch, Inc. can be served with process via its registered officer, Steven Temple, at 11080 W. Adonis Road, Marana, Arizona 85658, or via its registered agent for service of process in Arizona, Franklin Agency, LLC, 405 West Franklin Street, Tucson, AZ 85701.

## II.    JURISDICTION AND VENUE AND GOVERNING LAW

5.      This Court has federal diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because the parties are citizens of different states. The amount in controversy also exceeds the minimal jurisdictional threshold of $ 75,000, exclusive of interests and costs. Plaintiff has already incurred more than $ 25,000 in economic damages and more than $ 50,000 in mental anguish and other non-economic damages arising from Defendants' fraudulent and deceptive conduct and breach of an agreement to provide substitute goods.  Both of these figures are expected to rise.  Plaintiff has also already incurred in excess of $ 15,000 in attorneys' fees through the date of this filing in connection with this dispute, a figure which is expected to rise significantly as the litigation progresses, and Plaintiff has a statutory right to recovery of and is seeking attorneys' fees for his breach of contract claim. Plaintiff also has a right to recovery for and is seeking punitive damages for his fraudulent inducement claim.

6.      This Court has specific jurisdiction over each of the defendants because, without limitation, they have each purposefully availed themselves of the benefits and protections of Texas by establishing minimum contacts with Texas, and this Court's exercise of personal jurisdiction does not offend traditional notions of fair play and substantial justice.  Each of the defendants, without limitation, has directed business towards Texas and entered into contractual agreements with Plaintiff, a Texas resident, in which one party was to perform the contract in whole or in part in Texas. Defendants have also engaged in numerous verbal and written deceptive and fraudulent acts in Texas

**ORIGINAL COMPLAINT AND JURY DEMAND**                                          **PAGE**  2

and/or directed at Plaintiff, a resident of Texas, and such contracts, deceptive acts, and acts of fraud give rise to the claims asserted herein.  More specifically, Defendants placed phone calls to Plaintiff in Texas during which they made misrepresentations and deceptive and fraudulent statements designed to induce Plaintiff to enter into contracts, sent Plaintiff documents related to such contracts, negotiated such contracts with Plaintiff over numerous telephone and email exchanges, arranged delivery of a horse (by Defendants' agent) to Texas, and coordinated a pick-up of a horse (by Defendants' agent) in Texas.

7.     Venue is proper in the Dallas Division of the Northern District of Texas because all or a substantial part of the events or omissions giving rise to the claims and causes of action occurred in Ellis County, Texas.

8.     The laws of the State of Texas apply to this cause of action.

### III.     STATEMENT OF FACTS

9.     Plaintiff, Ryan Morrow, began raising roping horses and participating in roping events when he was in primary school.  He has more than 30 years of experience buying, owning, training, handling, caring for, and roping with horses bred, raised, and trained for the purpose of roping cattle for sport and in roping contests.  In August, 2018, Mr. Morrow's horse, "King," who he had owned for more than two years, suddenly died in a tragic accident.  Mr. Morrow needed to locate and purchase a new roping horse in order to compete in two upcoming competitions for which he had qualified which were scheduled to take place in the Fall of 2018.  The events in which Mr. Morrow was scheduled to rope are the United States Team Roping Championships ("USTRC") Finals, which took place on October 22-26, 2018, and the World Series Team Roping Finals, which is scheduled to take place in Las Vegas, Nevada, on December 10-14, 2018. The USTRC Championships and the World Series Finals are qualifying events exclusively for ropers who have achieved a certain level of roping skill. They represent "once in a lifetime" opportunities for Plaintiff.

ORIGINAL COMPLAINT AND JURY DEMAND                                    PAGE  3

10.     Mr. Morrow learned from an acquaintance that Defendants might have a suitable roping horse available and visited the web site of Defendants 4 Ropin Ranch, www.4ropinranch.com. 4Ropin Ranch Inc. has been in business since 1999, and its website represents that it "is a premier place to buy a team roping horse." The site further represents that "[o]wners Steve and Kim Temple have been in the horse business for many years," and "are members of the USTRC, World Series as well as having shown horses in the AQHA [American Quarter Horse Association]."[1] The site further states that the Defendants' philosophy "is to find a horse that matches your level of riding and roping" and that, "[a]t 4Ropin Ranch Inc., we try to take a lot of the surprise and guess work out of buying." The site further states: "[w]e spend a lot of time with our customers so they get the best suited horse for their needs. We sell horses all over the country to a wide range of skill levels. 4Ropin Ranch horses can be seen competing at most major roping events around the country including the USTRC Finals, the World Series Finale, as well as the PRCA Wrangler National Finals Rodeo. If you are in the market for a quality team roping horse, 4Ropin Ranch Inc. is ready to help make your buying experience a good one." According to the web site, as of the date of the filing of this complaint, Defendants have sold at least 375 roping horses, and pictures of all 375 horses Defendants have sold can be viewed on the site. Based upon the information on the 4 Ropin Ranch website, Mr. Morrow concluded that Defendants were knowledgeable, reputable competition roping horse dealers he could trust to provide him with a suitable roping horse to replace King.

11.     Plaintiff reviewed the web site in detail and looked at the available horses on the site in August of 2018. On the site, he found an advertisement for a horse identified as Big Rig. The horse identified as Big Rig is a 2009 AQHA Buckskin Gelding, AQHA # 5182644, with the registered name Big Buck Joe (hereinafter, "Big Rig"). The advertisement included a photograph of Big Rig and

---

[1] AQHA is an international association dedicated to the preservation, improvement and record-keeping of the American Quarter Horse.

a detailed description which identified Big Rig as a 1300-pound gelding standing 16 hands. The advertisement further represented that Big Rig is a "a finished head horse that has been hauled to jackpots and some rodeos," has "all the speed and size to catch the bigger, faster pen of steers," and yet, "rates and handles the little fresh ones just as well," and is "the whole [roping horse] package, looks, pedigree, ability, and disposition."

12.     Based upon this advertisement, Big Rig appeared to meet Mr. Morrow's needs. Accordingly, Mr. Morrow contacted Defendants about potentially purchasing Big Rig. Plaintiff identified himself as a highly skilled USTRC #5 roper. He also told Defendants that his previous roping horse had suddenly and tragically died and that he needed to quickly procure a large, skilled roping horse fitting the description of Big Rig set forth on Defendants' website in order to practice with and rope with the horse in the two Fall 2018 high skill level roping competitions identified in paragraph 9, above. Plaintiff identified the competitions by name and also mentioned the dates of the competitions.

13.     Plaintiff and Defendants began to negotiate the terms of an agreement for the purchase and sale of Big Rig. Both on their web site and during these conversations, Defendants made numerous false, misleading, and deceptive statements about Big Rig's skills, qualities, and characteristics. Such statements were made for the purpose of fraudulently inducing Mr. Morrow to enter into a contract to purchase Big Rig. Such false, misleading and deceptive statements include, but are not limited to, representations that Big Rig:

      a.   possesses the qualities and characteristics he specifically is represented to have in the above described advertisement and possesses the qualities and characteristics Defendant attributes to roping horses it sells generally (e.g., "if you are in the market for a quality team roping horse, 4 Ropin Ranch is ready to help…");

      b.   "is gentle inside and out of the arena";

c.   "scores well";

d.   "runs flat";

e.   "leaves the box flat";

f.   is an "exceptional roping horse";

g.   "faces extremely well";

h.   "runs to the hip";

i.   "allows the rider to dally around the corner without ducking out";

j.   "makes good moves across the middle";

k.   "flexes well";

l.   "gets the steers head well and goes in with a gentle approach";

m.   "makes a complete run"; and

n.   "is a roping horse" suitable and ready for competition, including, but not limited to the following 2018 national competitions: USTRC Finals on October 22-26, 2018, and the World Series Team Roping Finals in Las Vegas, Nevada, on December 10-14, 2018.

14.     The representations described in paragraph 13 a.-n. were material when made and were false.  When these representations were made, Defendants knew that they were false and/or made them without any knowledge of the truth and all such statements are positive assertions.  Defendants made the representations with the intent that Plaintiff should act upon them, and Plaintiff, Ryan Morrow, acted in reliance upon the representations when he purchased Big Rig, and thereby suffered injury. By making the representations described in paragraph 13 a.-n., Defendants also represented to Mr. Morrow that Big Rig is of a certain standard, quality, or grade that he is not.

15.     Defendants also failed to disclose medical and performance information concerning Big Rig that was known to Defendants at the time of the transaction which failure to disclose was

intended to induce Mr. Morrow into a transaction to purchase Big Rig which Mr. Morrow would not have entered had the information been disclosed.

16.     After numerous emails, text message and telephone conversations, on August 20, 2018, Mr. Temple sent a Purchase Agreement and Bill of Sale for Big Rig (the "Purchase Agreement"), to Mr. Morrow for review. A copy of the Purchase Agreement is attached hereto as Exhibit "A." [2]

17.     Mr. Morrow notified Mr. Temple over the phone that he did not want to sign the Purchase Agreement because, although he wanted to purchase Big Rig based upon Defendants' representations concerning Big Rig's characteristics, he did not wish to agree to certain of the contract's miscellaneous terms.  In response, Mr. Temple assured Mr. Morrow that he (Mr. Temple) "did not intend to enforce the contract," and told Mr. Morrow "not to worry about the contract" because "it is only for insurance purposes." These representations were material when made and were false.  When these representations were made, Defendants knew that they were false and/or made them without any knowledge of the truth and all such statements are positive assertions.  Defendants made the representations with the intent that Plaintiff should act upon them, and Plaintiff, Ryan Morrow, acted in reliance upon the representations when he purchased Big Rig, and thereby suffered injury.

18.     On August 27, 2018, after Mr. Temple's assurances, Mr. Morrow reluctantly signed the Purchase Agreement.

---

[2] The Purchase Agreement contains a narrowly drafter merger clause which states that the Purchase Agreement "shall be governed by the laws of the state of ARIZONA" and that a legal action "commenced to enforce or interpret" the Agreement "shall have venue and jurisdiction in PIMA COUNTY, ARIZONA." This action is not an action to enforce the Purchase Agreement nor has it been commenced to enforce or interpret the Purchase Agreement.

19.     Pursuant to the Purchase Agreement, Mr. Morrow purchased Big Rig from Defendants for $19,550.00, and he paid 4 Roping Ranch, Inc. this amount via a direct wire transfer on August 28, 2018, from Texas, to Arizona.

20.     Defendants coordinated the shipping of Big Rig (via Defendants' agent), from Arizona, to Texas, for delivery to Mr. Morrow.

21.     Upon Big Rig's arrival at Mr. Morrow's home in Texas, Mr. Morrow noticed that Big Rig was exhibiting signs of lameness in his front legs. Mr. Morrow believed this was normal, temporary lameness attributable to a large horse having just traveled 950 some miles in a trailer. Mr. Morrow let Big Rig rest for several days before riding him.

22.     Mr. Morrow initially rode Big Rig casually around his property in order to allow Big Rig to become accustomed to him, and he encountered no problems.  Mr. Morrow then invited his friends over to watch him rope with his new horse. Both Mr. Morrow, a highly skilled USTRC #5 roper, and Cuyler Williams, a professional USTRC #8 roper, attempted to rope with Big Rig. Mr. Morrow went first. When Mr. Morrow attempted to rope with Big Rig, the horse immediately became angry and aggressive, was non-compliant, and initially refused to even enter the head box.  In fact, Big Rig bit Mr. Morrow while Mr. Morrow was attempting to coax him into the head box.  Mr. Morrow eventually got Big Rig into the head box, but when Mr. Morrow released him to rope, Big Rig began to run and then, in full stride chasing steers, Big Rig cross fired, stumbled, and went into a straight running buck. Big Rig bucked so suddenly, violently, and unexpectedly that Mr. Morrow, a 6'4", 250-pound individual, was thrown head first in a cart wheeling motion off the front of the horse, and he feared that he had broken his collar bone. Nonetheless, Mr. Morrow got back on Big Rig and tried again. Again, Big Rig cross fired and bucked violently.  Mr. Williams then immediately attempted to rope with Big Rig, and again the horse cross fired and bucked violently.

23.     Cross firing describes a diagonal lack of coordination of a horse's front and hind legs in which the hind legs on one side make contact with the front legs on the other side in various gaits or strides and sometimes in varying speeds of movement. Leg interruption and cross cantering are other terms used to describe essentially the same type of movement or gait. The definition of lameness encompasses any stance or gait that is abnormal in a horse as it affects the locomotor system, and, thus, cross-firing in horses is essentially a lameness issue. The cause of the abnormality of the stance or gait can be structural, metabolic, or a result of a disease process as well as genetic or acquired in nature.  Pain may be the initial cause or an ongoing cause of cross firing, but it can also be due to general lack of flexibility, lack of athletic ability, or poor training, and may, after initial onset, eventually become a strong habit that is difficult or impossible to break.  It is a condition that can be or become a permanent lameness, and it interferes with the normal conformation and work performance of the horse.  Although it can be managed, a horse that consistently cross fires cannot compete in roping competitions because cross firing causes the horse to break stride and slow down, essentially letting the steer get away.  It is widely understood and commonly known to those in the roping community, especially those who are selling high end roping horses and riding roping horses for sport and in competition, that a horse that has a cross firing gait abnormality should not be sold for use in roping competitions at all, much less for roping competitions at a high level, much less for a roping competition that is scheduled to occur within 2-3 months.

24.     Numerous experienced ropers witnessed Big Rig's conduct and gait when Mr. Morrow and Mr. Williams attempted to rope with Big Rig. All agree with Mr. Morrow that what they witnessed, including the cross firing, stumbling, bucking, biting, and other non-compliant behavior in the  arena, establish that Big Rig does not have the characteristics, qualities, or benefits described in paragraph 13 a.-n., is not a roping horse at all, much less an exceptional one, and should not have been

represented to be a roping horse or sold to Mr. Morrow for Mr. Morrow to attempt to rope with him for sport, in the competitions identified paragraph 13n., or in any roping competitions.

25.     On September 6, 2018, Big Rig was examined by Dr. Justin High, DVM at the request of Mr. Morrow. Mr. Morrow requested the examination to determine if there might be a medical explanation for Big Rig's conduct in the ring.  After a thorough exam, Dr. High concluded that Big Rig was exhibiting left hind lameness, upper limb flexion, and fore limb soreness. That same day, Mr. Morrow called Mr. Temple to express his concerns about Big Rig. Mr. Morrow explained to Mr. Temple that, given Big Rig's inability to rope, due to the cross-firing and the lameness issues, Big Rig was not a roping horse at all, much less one that would be competent to perform in competitions, and, therefore, that he, Mr. Morrow, wanted to immediately return Big Rig to Defendants. Mr. Temple expressed his regret that that Big Rig had not performed appropriately in the arena and that he had bucked Mr. Morrow off.  Mr. Temple agreed that he/4 Ropin Ranch would take Big Rig back and issue Mr. Morrow an inhouse credit for the purchase price of Big Rig and allow Mr. Morrow to select a suitable replacement horse from Defendants' available horses.  Mr. Morrow agreed to this proposal (the "Replacement Agreement").

26.     On September 23, 2018, Mr. Temple sent an email from Arizona, to Mr. Morrow in Texas accompanied by two additional contracts drafted by Defendants, a Boarding Agreement and a Consignment Agreement. A copy of the email and its attachments is attached as Exhibit "B."  Mr. Temple requested that Mr. Morrow sign the documents for "insurance," and promised and agreed that, if Mr. Morrow would sign those documents and return Big Rig to 4 Ropin Ranch, 4 Ropin Ranch would provide Mr. Morrow with a substitute horse of the caliber promised, i.e a roping horse free from lameness or other conformity defects inconsistent with competing in roping events and capable of competently roping in premier competitions such as those identified in paragraph 13n., above.

Plaintiff signed and returned the Boarding Agreement and the Consignment Agreement to Mr. Temple in Arizona.

27.     Mr. Temple and 4 Ropin Ranch then arranged for Big Rig to be transported by Defendants' agent from Texas back to Arizona. When Mr. Morrow drove to the meeting location with Big Rig to meet Defendants' transporter, at the direction of Mr. Temple, Mr. Morrow noticed that the trailer appeared to be too small to transport a horse the size of Big Rig and was concerned for Big Rig's health and safety. Mr. Morrow then called Mr. Temple to voice his concerns. Mr. Temple responded by saying, "don't worry about it, it's not your problem anymore." Mr. Morrow remained concerned but did not feel it was his place to interfere with Defendants' transportation arrangements for Big Rig because he had agreed to return Big Rig to Defendants,' and thus to their care, pursuant to the Replacement Agreement.

28.     Mr. Morrow departed the meeting location, leaving Big Rig with Defendants' transporter, expecting Big Rig to arrive in Arizona the following day. An hour later, Mr. Morrow received a phone call from Mr. Temple, who stated that Mr. Morrow was right, the trailer was too small, and asked Mr. Morrow to go back to pick Big Rig up until alternative transportation arrangements could be made.

29.     When Mr. Morrow arrived at the meeting location, he noticed that Big Rig was bleeding from one of his feet. When Mr. Morrow asked Defendants' transporter what had happened, the transporter stated that Big Rig cross fired when exiting his trailer, and that, due to the trailer being too small, Big Rig cut the bottom of his foot. Mr. Morrow then called Mr. Temple to notify him of the injury.  During this call, Mr. Temple stated that, if Mr. Morrow would take Big Rig back to his property, Mr. Temple would find alternative transportation within the next couple of days. Mr. Morrow agreed to take Big Rig back to his property.

30.     Over the following two weeks Mr. Morrow called Mr. Temple numerous times to find out the status of Big Rig's transportation back to Arizona. Mr. Temple repeatedly advised that he could not find a ride for the horse. Mr. Morrow, frustrated and skeptical of Mr. Temple's purported struggle to find transportation, offered to have Clay Logan, a world-renowned horse trainer, transport Big Rig to Arizona for Mr. Temple, to which Mr. Temple agreed.

31.     When Clay Logan arrived at Mr. Morrow's property to transport Big Rig back to Arizona, Mr. Logan warned Mr. Morrow that he was concerned that Defendants might try to claim Big Rig had developed some kind of health issue while in Texas and either refuse to take the horse back or refuse to issue an inhouse credit as previously agreed. Mr. Morrow assured Mr. Logan that this was not a concern because he had spoken to the Defendants about Big Rig's cross firing and other behavior upon arrival in Texas and Mr. Morrow and Defendants had reached an agreement regarding the return of the horse and replacement with a suitable roping horse.

32.     On September 24, 2018, Mr. Morrow emailed Mr. Temple that Mr. Logan was transporting Big Rig to 4 Ropin Ranch and gave him an arrival date. Mr. Morrow also told Mr. Temple on the phone that Mr. Logan would want to see the other horses that 4 Ropin Ranch had available for him to use his purchase credit for the exchange of Big Rig, to which Mr. Temple agreed.  Mr. Logan transported Big Rig back to Arizona.

33.     Mr. Logan arrived at 4 Ropin Ranch and unloaded Big Rig. Mr. Temple met with Mr. Logan and took possession of Big Rig. Mr. Logan requested to see what other horses were available at 4 Ropin Ranch. Mr. Temple responded that he had been out of town and that there were no horses available. Then, when Mr. Logan started to further inquire about why there were no horses available, having driven a great distance for the purpose of returning Big Rig and selecting a suitable replacement horse, Mr. Temple asked Mr. Logan to leave. Mr. Logan then asked if he could return several days later to see available horses.  Mr. Temple responded that there would not be any available horses then

either. Mr. Temple made no mention of any health concerns about Big Rig at the time of exchange. He simply took Big Rig and refused to provide access to any potential replacement horses.

34.    After Defendants declined to provide Plaintiff with access to a selection of potential replacement horses, Plaintiff asked Defendants to return his money and refund his other expenses incurred in connection with the purchase and sale of Big Rig.  At this point, Defendants refused to return Plaintiff's money and suddenly began to falsely allege that Big Rig was sound when purchased and returned to Arizona lame and to demand that Plaintiff pay for Big Rig's medical bills incurred after his return to Arizona.

35.    Dr. High, DVM and Defendant's Arizona based veterinarian, Dr. Lindsey Smogler, DVM, have both recently examined Big Rig extensively and have reviewed Big Rig's medical records, and both doctors have determined that any lameness Big Rig has or may have is pre-existing in nature and is not attributable to any events that occurred either while Big Rig was traveling to and from Texas or during the short time that he was in Texas.

36.    Defendants who now possess both Big Rig and Plaintiff's money, have also, through their attorney, threatened to place a feed lien on Big Rig and to attempt take title of Big Rig (and keep Mr. Morrow's money) if Mr. Morrow does not pay a daily sum of $20.00 for horse feed for Big Rig.

37.    Plaintiff has sustained significant actual damages, both economic and non-economic, proximately caused by Defendants' fraudulent and deceptive conduct described herein and breach of the Replacement Contract.

38.    Plaintiff has suffered and continues to suffer severe mental anguish due to Defendants' fraudulent and deceptive conduct.  Plaintiff was also physically injured while attempting to rope with a horse that was represented to be an exceptional roping horse in all respects but which is completely unsuitable for roping, which he would never had done but for Defendants' deceptive and fraudulent

acts, and Plaintiff has suffered additional mental anguish from this horrific event and from his resulting physical injuries.

39. The Defendants' fraudulent, false, misleading, and deceptive acts and the Defendants' breach of the Replacement Contract are the producing cause of Mr. Morrow's damages and all such fraudulent, false, misleading, and deceptive acts were made both knowingly and intentionally or, alternatively, at the very least, recklessly.

## IV.     CAUSES OF ACTION

### CAUSE OF ACTION 1 – FRAUDULENT INDUCEMENT

40. Plaintiff restates and realleges each of the allegations set forth in paragraphs 1-39 as set forth above.

41. Defendants knowingly, intentionally, and/or recklessly made numerous false, fraudulent, and deceptive representations as described above for the purpose of inducing Plaintiff, Ryan Morrow, to enter into the Purchase Agreement and, later, into the Replacement Agreement.

42. The representations were material when made and were false.

43. When these representations were made, Defendants knew that they were false and/or the Defendant made them without any knowledge of the truth and all such statements are positive assertions.

44. Defendants made the representations with the intent that Plaintiff should act upon them, and Plaintiff, Ryan Morrow, acted in reliance upon the representations when he purchased Big Rig, and when he returned Big Rig, and thereby suffered injury.

### CAUSE OF ACTION II – BREACH OF THE REPLACMENT AGREEMENT

45. Plaintiff restates and realleges each of the allegations set forth in paragraphs 1-44 as set forth word for word.

46.     The Replacement Agreement is a valid and binding contract, Plaintiff complied with all of its terms, and Defendants materially breached the Replacement Agreement by failing to and refusing to offer Plaintiff a replacement horse when Plaintiff returned Big Rig to Arizona in accordance with the terms of the Replacement Agreement.

47.     Plaintiff has suffered actual damages as a result of Defendants' material breach of the Replacement Agreement.

## V.    DAMAGES

48.     Defendants are liable to Plaintiff for all of his damages proximately caused by Defendants' acts of fraud, deception, and breach.  Ryan Morrow seeks to recover all of his damages recoverable for Defendants' tortious conduct and breach of contract, including, but not limited to, his money paid for Big Rig, his money expended for transport of Big Rig, his post-sale expenses incurred for the care and treatment of Big Rig, his other and incidental and consequential damages, and his damages for mental anguish and pain and suffering.

## VI.    EXEMPLARY DAMAGES

49.     Defendants are also liable to Plaintiff for exemplary damages caused by Defendants' fraud which was the proximate cause of damages and injuries to Plaintiff.

## VII.    INTEREST

50.     Plaintiff would show that he is entitled to recover prejudgment interest for all elements of damages recovered for which the law provides recovery of prejudgment interest. Plaintiffs are also entitled to post-judgment interest at the lawful and legal rate.

## VIII.    COURT COSTS

51.     Plaintiff seeks the recovery of court costs as allowed by law on his damages as allowed by law.

## IX.    ATTORNEYS' FEES

**ORIGINAL COMPLAINT AND JURY DEMAND**                              **PAGE**  15

53.     Plaintiff seeks to recover reasonable attorney fees as allowed by law on his damages as allowed by law.

## X.

### NOTICE OF INTENT TO FILE CLAIMS UNDER THE TEXAS DECEPTIVE TRADE PRACTICE ACT

54.     Plaintiff has notified Defendants by letters dated November 12, 2018, and November 15, 2018, pursuant to the Texas Deceptive Trade Practices Act §17.505(a) ("DTPA"), that he intends to file a DTPA claim against Defendants to assert that Defendants, by and through their acts, omissions and misrepresentations violated the DTPA by committing false, misleading and deceptive acts which were the producing cause of injuries and damages to Mr. Morrow. Specifically, Mr. Morrow will assert that Defendants engaged in false and misleading acts by representing to Mr. Morrow in connection with Mr. Morrow's purchase of Big Rig from 4Ropin' Ranch, that Big Rig has certain characteristics, uses, and benefits that he does not have, by representing to Mr. Morrow that Big Rig is of a certain standard, quality, or grade that he is not, and by failing to disclose information concerning Big Rig which was known to Defendants at the time of the transaction, which failure to disclose was intended to induce Mr. Morrow into a transaction to purchase Big Rig which Mr. Morrow would not have entered had the information been disclosed.  Plaintiff intends to amend this complaint, to bring forth his DTPA claims not less than sixty (60) days after the date on which he gave written notice as per the notice requirements set forth in Texas Business & Commerce Code §17.505(a).

### XI.  DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury of all issues triable of right to a jury.

### XII.  CONCLUSION AND PRAYER

For these reasons, Plaintiff requests and prays that the Defendants be cited to appear and answer herein and that on final trial hereof, Plaintiff have judgment from, of and against Defendants,

both jointly and severally, for all actual damages sustained, and for exemplary damages and punitive damages from the Defendants, Steve and Kimberley Temple and 4 Ropin Ranch, Inc., as set out herein, together with all permissible costs of suit, prejudgment interest and post-judgment interest, court costs and attorney fees, which is allowed by law thereon, and for such other and further relief, both general and special, at law or in equity, to which Plaintiff is justly entitled.

Dated:  December 6, 2018                                   Respectfully Submitted,


                                                                By: /s/ Brian Wcislo_____
                                                                Tara E. Hanley (Tex. Bar No. 00784205)
                                                                Brian Wcislo (Tex. Bar No. 24098582)

                                                                WCISLO LAW GROUP, PLLC
                                                                3333 Lee Parkway, Suite 600
                                                                Dallas, Texas 75219
                                                                Telephone: 214.665.9460
                                                                Facsimile: 469.466.1178
                                                                brian@wcislolawgroup.com
                                                                tara@wcislolawgroup.com

                                                                **ATTORNEYS FOR PLAINTIFF
                                                                RYAN MORROW**